CLINTON DIXON, PETITIONER-RESPONDENT, v. HOLLEY & SMITH, RESPONDENT-APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued May 22, 1961—Decided June 27, 1961.

Before Judges PRICE, GAULKIN and SULLIVAN.

*Mr. Isidor Kalisch* argued the cause for the appellant (*Mr. Stanley U. Phares,* attorney).

*Mr. Frederick Klaessig* argued the cause for the respondent.

The opinion of the court was delivered by

GAULKIN, J. A. D. Petitioner Clinton Dixon obtained a workmen's compensation award, which was affirmed by the County Court. The employer appeals.

■ Petitioner was employed by the respondent as a helper on trucks delivering coal, and for general work in respondent's coal yard. Part of his duties included the loading of trucks. This (his brief says and respondent denies) was done "by standing in the body of the truck next to the bin overhead where the coal was stored, and then pulling the lever which would release the coal through a chute some 10 or 12 feet above the floor of the truck * * *"

Stated succinctly, petitioner's claim is that he developed an "incipient" ingrown toenail on the large toe of the left foot some time in January 1958; coal from the chute struck the "soft" toe of his work shoe (an alleged sample of his shoe was introduced in evidence); this exerted pressure on the toenail sufficient to cause the nail to make a microscopic puncture in the skin of "the nail groove * * * of the great toe"; staphylococcus entered through the puncture, causing infection; this in turn caused gangrene, which necessitated amputation of the leg in November 1958. The employer, on the other hand, contends that there was no such "accident" or injury, and that the gangrene was merely the end result of petitioner's admittedly far advanced arteriosclerosis.

The petitioner described the manner in which he claimed the coal struck his foot as follows:

"Q. Well, do you stand on any part of the truck when you pull the lever? A. You stand in the truck body.

Q. That is lower than if you were standing on the edge of the truck? A. Yes, way lower.

Q. Now, you say that the chute opening was about four feet over your head. Is that right? A. Yes.

Q. The chute opening. A. Yes, where the coal came out of the wall.

Q. And do you stand under the chute? A. Oh, no. Oh, no. I don't stand under the chute.

Q. The coal does not come down and hit you on the head, does it? A. No, sir.

Q. It doesn't hit you on the face? A. No.

Q. It doesn't hit you on the shoulders? A. Sometimes.

Q. On the shoulders? A. Sometimes, yes.

Q. On your arms? A. Oh, yes, sometimes.

Q. On your chest? A. No, it don't come there.

Q. On your back? A. No. You pull like that. It comes down, bounces all over your arm, down on your feet.

Q. Ever hit the back of your feet? A. No. It hit the front.

Q. Ever hit the front of the right foot? A. It hit both of them, but this is the nearest one to it. I am left-handed. When I stand, I have to stand to that side. It goes right down on my foot.

Q. Ever hit your left shoulder? A. Oh, yes.

\*     \*     \*     \*     \*     \*     \*     \*

Q. How long would it take to load a truck from the chute? A. Well, according how much you are going to put in the truck.

Q. Well, how much do you usually put in it? A. Some four tons, three tons.

Q. How long would it take to load four tons from the chute? A. I can load it in about six or seven minutes.

Q. Six or seven minutes? A. That's right. That is four tons."

The employer's witnesses testified that one who opened the chute would not and could not stand in the bed of the truck, for he would then be unable to reach the chute; he would have to stand on the side wall of the truck, and there he would not be struck by coal.

The largest size coal loaded was "stove," but petitioner admits that smaller sizes were handled. The employer's office manager, Miss Walley, testified that most of the coal was "nut." We examined the shoe which petitioner introduced in evidence. Petitioner doubtless wore socks as well, especially since the accident allegedly happened in January. Obviously very little of the coal which came from the chute could have struck petitioner's shoe. We found it difficult

to comprehend how coal, falling as described by petitioner, could have delivered a blow or exerted pressure through the shoe and the sock sufficiently strong to force the toenail into the skin and cause a puncture. However, since the Division and the County Court had ruled in favor of petitioner, we examined and re-examined the evidence with great care to determine whether any reasonable basis for affirming existed. We find that, even after giving due regard to all of the consequences flowing from the fact that the Deputy saw and heard the witnesses, we are unable to accept petitioner's uncorroborated testimony that he suffered the "accident" which he described. We find further that, even if the coal did strike his foot, it was not the cause of the gangrene or of the amputation.

Petitioner testified that he first felt pain when coal fell on his shoe in January 1958. He asserted that he had loaded coal in the same fashion for 15 years without pain. It is the employer's position that if contact of coal with the shoe did then cause pain it was because Dixon's toe had become sensitive due to the advance of his arteriosclerosis, and the pain was not indicative of a substantial blow or pressure. Respondent's doctors described the possible pain from peripheral arteriosclerosis as exquisite and excrutiating.

Petitioner admits that he continued to work without seeking medical attention until February 21. There is no testimony that during that period he did anything to protect his feet from falling coal, or to change his shoes. On February 21 he went to Dr. Davis, a chiropodist. He claimed that before he went to Dr. Davis he told Miss Walley that he "had to go to the doctor because my toe was sore from the coal falling on it." Petitioner admitted that he mentioned this to Miss Walley only once. There is no evidence that petitioner ever asked the employer for treatment before he went to Doctors Davis, Zingler or Greenfield, or that he asked to be given other duties or to be otherwise protected from the falling coal.

Miss Walley denied he ever said anything to her about falling coal. She testified that "He came in one morning * * * he just mentioned that he had an ingrown toenail and it was giving him a lot of trouble and he thought he was going to go to the doctor about it." She testified that on a later date petitioner "said that he had been to the doctor and that the doctor removed his toenail and it was giving him a great deal of pain, and he also mentioned that he was not going back to that doctor, he was going to some other doctor." This, as we shall see, coincides with an important part of Dr. Davis' testimony. Dr. Davis testified for petitioner.

Petitioner testified that when he "first felt pain" he looked at his toe and saw it was "bruised," and "that's why I went to the doctor with it." However, Dr. Davis' testimony was to the contrary. The doctor was emphatic that Dixon complained "he had an ingrown nail." Referring to his record, Dr. Davis testified:

"Q. In answer to this question 'Nature of complaint' there is something in quotes that I can't make out. What is that? A. That says ingrown nail. It is in quotes simply because it is what he said. This is what the patient said. This was not my finding."

Dr. Davis himself diagnosed it as "a condition that was approaching the point where it would become an ingrown toenail." He said "The ingrown nail itself would be constituted by having the nail penetrate the flesh. In this case the nail had not penetrated the flesh. *It was more or less pressure along the nail groove * * *"* (Emphasis added.) To relieve this pressure he "packed" the nail. The packing, he said, "acts as a slide, the nail sliding over the packing," to prevent its penetrating the flesh.

On the two occasions Dr. Davis saw Dixon (February 21 and 24) he saw no infection and only a "very slight redness," but more pain than he expected from the "incipient" ingrown nail. Petitioner's own Dr. Greenfield admitted the redness could have been caused by the arteriosclerosis. Dr.

Davis' observation of unusual pain in the absence of infection supported the opinion of the employer's medical experts that petitioner's condition was due to the arteriosclerosis.

However, Dr. Davis claimed he remembered (although it was not noted in his records) that Dixon told him "this pressure * * * [along the nail groove] was due to the fact that coal was beating down on his toe." He added "This may have been. I cannot attest to that. But it is the same picture that you would get from having the nail pressed along the nail groove." It is difficult to determine just what Dr. Davis meant by that. He could not have meant the *temporary* pressure of the coal caused the permanent pressure which he saw, and which he relieved by packing. At most, it would appear he meant that an object falling on the toe would momentarily exert the same pressure that the nail was constantly exerting when he saw it on the 21st. In any event it *is*, to say the least, odd that the doctor would note in his records the petitioner's own diagnosis of "ingrown toenail"—a diagnosis with which he did not agree and which could be of no aid or importance to him in his treatment—and yet would fail to note, if Dixon had said it, that "this pressure * * * was due to the fact that coal was beating down on his toe." Furthermore, taken literally, this was a medical judgment which Dixon could not have uttered, since he was not competent to form it. On the other hand, if it was a conclusion that Davis had formed on the basis of a history given him by Dixon, why was there not that history, or at least some reference to falling coal, in the doctor's record? More important, why is it that he did not direct Dixon to avoid falling coal, or to protect his toe from it with heavier shoes or socks, or by bandaging or otherwise? Admittedly, he gave no such instructions, even though he gave Dixon specific instructions to avoid coal *dust*. For example, he told him to wear "an extra pair of socks, if necessary, to keep the dust away from the skin." The witnesses Wade and McIntyre, repre-

sentatives of the employer's insurance company, testified that, when they interviewed Dr. Davis, he gave them no history of falling coal.

Petitioner testified his toe still pained him after Dr. Davis' treatments but that he continued to work with the coal hitting his feet as before until "March or April" when the company went out of business. Respondent's proofs were that petitioner's employment ended February 28. Whatever the period of employment, not only was there no proof that petitioner did anything to protect his foot but, on the contrary, he said:

"Q. Did you do anything yourself about the shoes you were wearing? A. Yes, I did. I split the top of my shoe. I split it up so I could get my foot in.

Q Did you go back to work? A. Yes, I did.

Q. Did you go back to unloading—to loading the truck with coal? A. Oh, yes.

The Deputy Director: Load?

The Witness: Load and unload.

Q. And you loaded the same way you described earlier? A. That's right.

Q. And was the coal beating on this sore toe? A. That's right.

Q. Now, referring to P-1 for identification, Mr. Dixon, can you demonstrate to us where you cut this shoe? A. Well, I just cut the shoe here (indicating). I made a cut.

The Deputy Director: Let Mr. Phares see.

Mr. Klaessig: Indicating the right side.

The Witness: I cut this here, and I cut this side down like that, to kind of give it a 'V', so this would have a cover over the toe. It would not be exactly open on top of the toe. So I just cut it this way.

Mr. Klaessig: I still don't understand. Do you, Mr. Phares?

Mr. Phares: No.

The Witness: Well, I will show you. See this is my toe. I split it, cut down like that, to here. Well, that loosens this top up.

Mr. Klaessig: I see. So that would be loose. That would relieve pressure.

The Witness: Relieve pressure on top of the toe. But this part of leather would rest on top."

If it were the coal that was hurting him, as he said, we find it incomprehensible that Dixon would not only take no steps to avoid the infliction of that pain in some fashion

but would, on the contrary, cut open the shoe! The normal human reaction, even without medical advice, would be to cover and protect the toe, and since it did not happen here, it casts great doubt upon whether coal was the cause of the pain.

For about five weeks after his last visit to Dr. Davis on February 24, Dixon had no medical attention. Then, on April 3, he went to Dr. Zingler, another chiropodist. Dr. Zingler found that the toenail *was* then ingrown and the toe *was* infected. Since the toenail was not ingrown when Dr. Davis saw Dixon, and the toe not infected, the toenail must have become ingrown and the toe infected during the five weeks *after* February 24. This is significant, because petitioner's own Dr. Yaguda testified that while "the falling of any object" on an "incipient" ingrown toenail with sufficient force to "impress it into the flesh underneath it might produce the microscopic break that would introduce the infection," an actual ingrown toenail, such as Dr. Zingler found, could itself introduce infection.

Dr. Zingler had no record or recollection of any mention of falling coal. On the contrary, he found Dixon's shoes too short, and he found no bruise. He treated Dixon a number of times and saw him for the last time on April 28. He was not asked his opinion as to the cause of petitioner's condition.

Again Dixon went without medical attention for a long time—April 28 to July 1, when he first saw Dr. Greenfield. Dixon did not give Dr. Greenfield a history of falling coal. Dr. Greenfield apparently did not find anything that urgently needed attention, as, for example, the degree of infection one would expect to find if, as Dr. Yaguda said, staphylococcus had entered the toe prior to February 21, when Dixon first saw Dr. Davis. On the contrary, Dr. Greenfield told Dixon to come back in 6 weeks—on August 12. On that date Dr. Greenfield advised Dixon to enter the hospital, which he did on September 3 with an admitting diagnosis of gangrene. He did not respond to conservative measures,

and on November 7, 1958 his leg was amputated by Dr. Webb. This was about 10 months after the alleged "accident" in January 1958 and almost nine months after Dixon's first visit to Dr. Davis, when, according to Yaguda's assumption, the infection had already set in.

In a hypothetical question Dr. Greenfield was asked by counsel for petitioner to assume that "large masses of coal of various sizes" fell on Dixon's toe. There was no such testimony. Indeed, Miss Walley testified that respondent corporation was dissolved in September 1957 and made its last delivery of coal in October 1957. It then made arrangements with Bouknight, one of its former employees, to get rid of the balance of the coal in the hoppers and lying about the yard. In anticipation of dissolution, respondent had stopped purchasing coal some time before September 1957. During January and February the total sales of coal amounted to 105 tons, mostly nut.

Dr. Greenfield testified that in his opinion the blow of the coal "started off the infection and caused deterioration of the tissue and the other conditions * * * and ultimate amputation." He gave as the "one big reason" for this opinion "the fact that his arterial tests at the hospital showed that there was no real occlusion of his blood supply to his big toe." Dr. Greenfield is a general practitioner. Dr. Webb, the surgeon who amputated the leg, and Dr. Deibert, a specialist in surgery with 40 years experience in treating, operating and teaching in the field of hypertensive arterial vascular disease, said (as we shall see) that there definitely was occlusion. Furthermore, on cross-examination, Dr. Greenfield gave this testimony, which we find quite remarkable:

"Q. * * * will you tell me when did the coal fall on his foot? A. I don't know.

Q. Would it make any difference when it fell on his foot, having in mind that he was in the hospital in November of 1958? A. Yes, it would make a difference—the time element.

Q. Now, what kind of coal fell on his foot? A. I don't know.

Q. Would that make a difference? A. I imagine the size of the coal and the height which it fell would make a difference.

Q. The height from which it fell? A. Yes.

Q. And the quantity of it that fell? A. Yes, sir.

Q. You don't know any of these things? A. No, sir.

The Deputy Director: You say it would make a difference, Doctor. What difference?

The Witness: Well, the size of the coal to me would be how much injury a man would get from a small lump or a big lump, and the distance it fell, depending how much damage it would do.

The Deputy Director: Would it make a difference in your opinion?

The Witness: No.

The Deputy Director: All right.

Q. It would not make any difference in your opinion? A. No.

Q. You mean if coal fell on Mr. Dixon's foot five years before November of 1958, that you would still say that his amputation was related to that coal falling on his foot five years ago? A. I thought we are talking about the size of the coal and the distance it fell, not the time element.

Q. The time element would make a difference? A. Yes.

Q. And you say the size of the coal would not make a difference? A. It would make a difference, yes.

Q. As to your opinion of causal relationship? A. No.

Q. It would not make a difference? A. No.

Q. Do you know what rice coal is, Doctor? A. What what is?

Q. Do you know what rice coal is? A. Never heard of rice coal, no.

Q. Well, it is coal about the size of a grain of rice. Do you think that would cause this?

\*      \*      \*      \*      \*      \*      \*      \*

A. Yes, I feel it could.

Q. It could? A. Yes, sir.

Q. Well, how much rice coal would have to fall on his foot for you to say that in your opinion as a doctor that was the causative factor in this case? A. I suppose a pailful.

Q. A pailful? A. Yes.

Q. You mean in the pail? A. Or out of the pail.

Q. You mean just pouring a pailful out on your foot? A. Yes.

Q. With the shoe on? A. I think it is possible, depending on the height it was falling from.

Q. Well, how high are you assuming that this coal fell from? A. Maybe four or five feet.

Q. Where did you get that? A. You are asking me to assume.

Q. I am not asking you to assume anything, Doctor. You were given a question with facts that you were asked to assume. Now, you are saying maybe four or five feet. I want to know where you got four or five feet. A. I am judging that probably from the height of the chute.

Q. Did you see the chute? A. No.

Q. Was anything told you in the question about the chute? A. No.

Q. What are you doing—guessing? A. I like to have you proceed with the question.

Q. My question right now, Doctor, is: Are you guessing? A. Yes, I am guessing."

On cross-examination Dr. Greenfield admitted that Dixon's hypertension and arteriosclerosis could have created internal pressure in the toe and caused it to swell and "that in itself, causing the toe to swell, would create pressure between the toe and the shoe."

It then developed that Dr. Greenfield had with him, when he testified on direct examination, a summary of the testimony of Dr. Yaguda and the other witnesses who had testified two weeks earlier. The cross-examination as to this paper was as follows:

"Q. And reading this typewritten paper here, it says—I am quoting from it: 'Patient had never had complaint of pain in big toe before January or February 1958, and the continuity of a complaint of pain after trauma from that date, with infection increasing, makes the bruising of the toe by coal the most probable source of the infection.'

That was given to you by the lawyer in this case, wasn't it? A. That was sent to me, yes.

Q. And that was the language you used in your testimony here, 'the most probable source of the infection,' wasn't it? A. Yes, sir."

Petitioner's counsel said this was a summary of Dr. Yaguda's testimony.

Dr. Yaguda was petitioner's principal medical witness on causation. In spite of Dr. Davis' testimony that there was no infection when he saw Dixon, Dr. Yaguda testified that the slight redness which Dr. Davis saw indicated infection. "Pain and redness are two of the cardinal symptoms of inflammation, and with the two of them there, even though there was no swelling, and we don't know whether there was any increased heat, it is reasonable to assume that at that time even there had already been infection in the toe." We pause to point out that if pain is evidence

of infection, then if the coal fell and caused pain in January the infection must have existed in the toe already, or the blow from the coal was so powerful as to cause pain through shoe and sock.

The assumption of infection was the sole support of Dr. Yaguda's opinion that the falling coal was responsible for the amputation. We find no basis in the evidence for this assumption. As we have said, petitioner's Dr. Davis said there was no infection; petitioner's Dr. Greenfield admitted that the redness could have been due to the arteriosclerosis; and respondent's doctors, including the surgeon who amputated the leg, were certain the redness was due to arteriosclerosis. No one other than Dr. Yaguda testified to the infection assumed by him, nor did anyone give any evidence which justified such an assumption.

We give way to the Deputy's finding of credibility, where he makes such findings. See Sahm, "Demeanor Evidence," 47 *A. B. A. J.* 580 (June 1961). Here the Deputy made no express findings as to Dr. Yaguda's credibility. On the contrary he said:

"One thing must be said for Dr. Yaguda: No matter which side he may be on, he is always quite positive."

This is not praise of the credibility of a medical witness. Yet, in the case at bar, Dr. Yaguda had in fact stated his conclusion of causation in this rather equivocal fashion, quite odd for an experienced witness who gave the impression which the Deputy noted:

"Q. And can you state, Doctor, with reasonable medical certainty, that this infection probably originated from this trauma assumed in the hypothetical question? A. Yes. I believe that, seeing that this is a competent producing cause and that it does occur, I think that it would be very difficult to exclude this as the cause of the infection."

However he was positive that "there was no obliteration [of the blood vessels], there was no thrombosis or blockage of the vessels to produce the gangrene and there was definite

evidence of infection which produced the gangrene. There was no occlusion there that was shown by the arteriogram taken at the hospital."

Dr. Webb, the surgeon who amputated the leg, said that Dixon had far advanced peripheral arteriosclerosis; "the ultimate result of this disease is gangrene * * * with loss of extremities * * *" He was certain that neither trauma nor infection had anything to do with the amputation because if there had been trauma or infection in January the gangrene would have developed in a matter of days or weeks. Furthermore, infection would have caused "wet" gangrene, which Dixon did not have. Dr. Webb said:

"A. * * * you have what we call or what is known medically as dry gangrene. In the presence of bad infection it becomes what is known as wet gangrene. This is a much more serious situation, that is, the patient becomes quite toxic and, as I say, more serious. Therefore, in any gangrenous extremity we do not like to see infection get a good foothold. As I remember Mr. Dixon's situation, I wasn't worried about wet gangrene; I was worried about how much dry gangrene he had, which is basically arteriosclerotic."

On cross-examination he said:

"Q. Why can't that infection last for nine months? A. Because in the presence of arteriosclerosis to the extent this petitioner unfortunately has it, it would not last nine months; he would have been in trouble long before nine months."

Respondent's Dr. Irwin E. Deibert testified that he specialized in surgery and was a member of the Board of Examiners of the American Board of Surgery. He was on the faculty of the School of Medicine of the University of Pennsylvania, consultant surgeon to various hospitals, and past president of the Society of Surgeons of New Jersey. He had had 40 years experience with conditions such as Dixon's "in treating, operating and teaching." He testified that the trauma in January could not be related to the amputation in November; that "pain out of all proportion * * * is one of the classical symptoms of peripheral vascular disease; * * * infection results sooner or later in all instances

where tissues break down due to poor circulation," and whatever infection existed here was due to the progress of the disease.

The opinion of Dr. Yaguda that there was no occlusion was based on the hospital X-Ray report which read as follows:

"Femoral arteriographic study of this patient on the left side shows the femoral artery is well visualized. There appears to be some dilation in it's upper end and poor filling at it's distal end with some irregularity suggesting the presence of atheromatous changes. No definite evidence of obstruction can be demonstrated."

Dr. Deibert testified that "dilation at its upper end and poor filling at its distal end * * * means that circulation is bad from that point on down." The femoral artery is the major artery in the lower extremity. Both Dr. Webb and Dr. Deibert testified that in this disease the smaller arteries would occlude prior to the femoral artery. Dr. Deibert said:

"Q. * * * You do not know whether or not in the left toe there was any occlusion of the blood vessels, do you, sufficient to cause the spontaneous origin of this condition found in the left toe? A. Yes, I do. There would have to be.

Q. Why would there have to be? A. You couldn't have this condition otherwise."

Dr. Webb testified, under cross-examination, as follows:

"Q. In this x-ray of the vascular system, reading the last sentence of it, 'No definite evidence of obstruction could be demonstrated.' You do know from the information that there was no obstruction of any important vessel, did you? A. Indeed we did.

Q. Where would that be indicated? A. The arteriogram. That report, for instance, indicates that.

Q. Which one are you talking about? A. The one you are reading.

Q. That is September 22, 1958? A. That's right. That indicates the state of the femoral artery. This is the main artery coming down into the lower extremity. This indicated a partial, certainly obstruction to flow, and the important thing in the interpretation of that is what goes beyond, what is the state of the vessel below the knee. This simply gives you a picture of the artery confined to the knee.

Q. Yes. A. Now, we have clinical evidence by physical examination that the circulation is insufficient below the knee. As I recall, and if I could get the time to look through the record, I could probably pick it up specifically. But as I recall, there was absence in pulsation of the posterior tibial artery and the dorsalis pedis artery and I believe the popliteal. And this indicates an obstruction at that level, which is lower. And this is quite typical of a patient with arteriosclerosis. You don't get a blocking off of a major vessel in the thigh until a later stage of the disease. It does happen, but as the disease progresses it usually moves away listally from a proximal position.

\* \* \* \* \* \* \* \*

Q. This notation of 'no obstruction can be demonstrated' is a pretty good index of the general system in the nature of obstruction to the total limb, left foot, left leg? A. Definitely not.

Q. Your statement is, then, it is only an entry significant for future treatment? A. It is only an entry of circulation in the thigh. It has nothing to do with the circulation below the knee."

No purpose would be served by analyzing any more of the over 200 pages of testimony. Suffice it to say that on the basis of all of it we find that the petitioner has failed to sustain his burden to prove that the amputation was due to an "accident" which arose out of his employment. The judgment in favor of petitioner is therefore reversed and judgment is entered for respondent. No costs.

SULLIVAN, J. A. D. (dissenting). I recognize that this court must weigh the evidence and determine whether petitioner has sustained the burden of proof and I must concede that there are weaknesses in petitioner's case. However, in weighing the petitioner's proofs as against the employer's proofs, "there must be thrown into the scales the general tendency of the law to apply the Compensation Act in the employee's favor when in doubt." *Aromando v. Rubin Bros. Drug Sales Co.*, 47 *N. J. Super.* 286, 293 (*App. Div.* 1957), certification denied 26 *N. J.* 244 (1958).

Both the Division of Workmen's Compensation and the County Court found in petitioner's favor and I am unwilling to disturb their considered judgment. I would adopt their findings and conclusions and would affirm.